UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., and RYAN DEVEREAUX<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendant. | Civil Action No. 23-10922 (PAE) |

DECLARATION OF NICHOLAS BANCO,

FREEDOM OF INFORMATION ACT OFFICER, NATIONAL PARK SERVICE,

UNITED STATES DEPARTMENT OF THE INTERIOR

I, Nicholas Banco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I.  **Introduction**

1. I have been employed by the Department of the Interior (Department) for the past nine years and four months. Since December 31, 2023, I have been the Freedom of Information Act (FOIA) Officer for the National Park Service (NPS). Before that date, I had been the Acting Freedom of Information Act Officer for NPS since July 19, 2023. Before coming to NPS I held the position of Attorney-Advisor in the Departmental FOIA Office, where I had worked since June 2, 2019. For the four years prior to that I was a FOIA processor in the Office of the Secretary's FOIA Office within the Department.

2. In my capacity as NPS's FOIA Officer, I am responsible for overseeing responses to FOIA requests made to the NPS, and for providing supporting declarations when a FOIA requester has filed a Court action.

3. The FOIA request at issue in this litigation was originally processed before my time as NPS FOIA Officer, during the period in which Charis Wilson was FOIA Officer for NPS FOIA. Ms. Wilson worked as FOIA Officer for approximately 14 years.

4. All of the information set forth above in this declaration is based upon my personal knowledge and/or experience, my personal review of Plaintiff's FOIA request and documents, upon information furnished to me by other NPS and Department employees in my official capacity, and/or my review of records kept by the NPS FOIA Office in the ordinary course of business. I am making this declaration in support of the Department's motion for summary judgment.

II.     **FOIA Request and Processing**

5. NPS FOIA received a FOIA request via the FOIA-online portal from Ryan Devereaux, a reporter affiliated with Intercept Media, on June 20, 2022; the requestor also sought expedited processing. A true and correct copy of the FOIA request received by NPS FOIA is attached hereto as **Exhibit A**. The FOIA request was assigned the number: DOI-NPS-2022-004441.

6. The FOIA request sought the following information:

On January 30, 2022, a wolf that was collared and studied by Yellowstone National Park staff was shot and killed outside park boundaries in Southwest Montana, near an area known as Beattie Gulch. The individual who shot and killed this animal was a National Park Service employee. The National Park Service staff conducted an investigation into this incident and the conduct of its employee. I am seeking all files created by the National Park Service in conjunction with this investigation.

7.  On June 22, 2022, NPS FOIA denied the request for expedited processing, and informed the requester of his right to appeal this denial. NPS FOIA also stated that the request fell into the simple processing track, and that it expected to be able to provide a determination by July 20, 2022. A true and correct copy of the June 22, 2022, NPS response is attached hereto as **Exhibit B**.

8.  NPS provided its determination on July 15, 2022, granting in part and denying in part the request, and withholding approximately 247 pages of the 296-page responsive file under FOIA exemptions (b)(6) and (b)(7)(C). A true and correct copy of the July 15, 2022, FOIA response (without attachments) is attached hereto as **Exhibit C**.

9.  The Department's FOIA Appeals Office received Plaintiff's appeal of the withholdings in NPS FOIA's July 15, 2022, response. On August 21, 2023, the FOIA Appeals Office denied Plaintiff's appeal. A true and correct copy of the Appeals Office denial is attached as **Exhibit D**.

### III. Responsive Records and FOIA Withholdings Applied

10.  NPS FOIA identified one file that was responsive to the FOIA request. This was a 296-page investigative file relating to an internal investigation conducted by the NPS Office of Professional Responsibility (NPS OPR) in response to a complaint received by NPS OPR on February 10, 2022, related to allegations of misconduct by personnel at a NPS Office in Yellowstone National Park (the "Investigative File"). Specifically, the incident at issue in the investigation occurred on January 20, 2022, and related to a wolf hunted and killed near the Park boundary at an area called Beattie Gulch. In connection with this hunt, allegations of misconduct were made against NPS personnel from the Northern District Law Enforcement

Office, and Park leadership requested an investigation by NPS OPR which was conducted between February and April of 2022.

11.     While it was ultimately determined that no hunting took place inside the Park, that finding did not in itself address all the misconduct claims at issue in the NPS OPR investigation and report.

12.     Within Yellowstone National Park, law enforcement operations are divided into four Ranger Districts: North, West, Lake, and Backcountry; North, West, and Lake all have geographic boundaries, while the Backcountry District has Parkwide responsibilities. The Northern District office is located in Mammoth, Wyoming.  At any given time, the NPS Mammoth Law Enforcement Office has about seven assigned staff; approximately six Justice Center personnel are stationed at Mammoth as well. The Yellowstone Justice Center houses a jail and courtroom, and its Justice Center personnel are primarily tasked with their operation. The closest community to the Mammoth Office outside the Park is Gardiner, Wyoming, located approximately 4.8 miles away.  It is a community of between 700 and 800 people. Staff from the Mammoth Law Enforcement Office are frequently called upon to respond to the community of Gardiner in a mutual aid capacity as there are no local county deputy sheriffs based in the area, and the County Sheriff's Office is based at the county seat, 52 miles away.  Beattie Gulch is an area outside the Park located just outside of Gardiner.

13.     NPS OPR's mission is to uphold the best interests and confidence of the public and NPS employees by conducting independent investigations of alleged NPS law enforcement officer misconduct.  When allegations of misconduct by NPS law enforcement officers arise, the NPS OPR determines whether an internal investigation is justified, and if so, completes the investigation in a timely and thorough manner.

14. A Special Agent in Charge manages the NPS OPR program. The NPS OPR special agent in charge and designated staff are responsible for classifying and investigating misconduct allegations involving national park law enforcement officers. Misconduct allegations may include the violation of any standard imposed by criminal or civil law and applicable rules of professional conduct or departmental policies. Once NPS OPR completes an investigation, it notifies the complainant, and provides the report to the employee's supervisor of record for appropriate action.

15. As detailed in the index attached hereto as **Exhibit D** (the "Vaughn Index"), certain information was withheld from the Investigatory File on the basis of FOIA Exemptions (b)(6) and (b)(7(C). The following categories of materials in the Investigatory File were withheld in full or in part:

- Transcripts of interviews conducted in person or by phone with witnesses and subjects, including notes and photographs provided by witnesses.

- The Report of Investigation: a multi-section narrative by the NPS OPR investigator describing the specific allegations of misconduct, summarizing the course of the investigation, the evidence, and its conclusions.

- Four Investigative Activity Reports: narratives by the NPS OPR investigator summarizing interviews with witnesses and/or subject(s), including direct quotation and paraphrases from interviews, and evidence provided by witnesses.

- Images and records of communications from NPS cellphones.

- Citations to specific regulations and code of conduct sections, the alleged violation of which were the subject of the misconduct investigation.

- Documents signed by witnesses and/or subjects describing specific circumstances of witnesses and/or subject(s).

16. Per Paragraph 3, above, Plaintiff's request was originally processed by Ms. Charis Wilson who was the FOIA Officer for NPS FOIA. In the context of the current litigation, I reviewed the FOIA Office file associated with the request, including the *Intercept* article cited by Plaintiffs in the complaint in this action, and reviewed the Investigatory File and all the redactions made to determine whether all redactions were justified and whether there was any additional segregable information which could be released.

17. It was also clear from the Investigatory File itself, particularly the witnesses' statements in both transcripts and the Investigative Activity Reports, that the events at issue in the investigation took place in a very small workplace and community in which many of the individuals mentioned in the file knew each other well and interacted on a routine basis. As such, they would be very likely to be familiar with identifying details of each other's life and work routines, as well as identifying details such as particular habits of speech.

18. Additionally, in reading the both the Investigatory File and the *Intercept* article that was appended to the Complaint in this case, it was clear to me that there were strong feelings within the community about wolves and wolf hunting in general, and the incident that precipitated the misconduct claims being investigated by NPS's Office of Public Responsibility (OPR) in particular. As such, I was particularly aware of the stigmatizing consequences that an individual could suffer if identified in this law enforcement Investigatory File, including embarrassment and harassment.

19. FOIA Exemption (b)(6) authorizes agencies to withhold information about individuals that is contained in "personnel and medical files and similar files," when release of

the information would constitute a "clearly unwarranted invasion of personal privacy," i.e., when the privacy interests in that information outweigh the public interest in disclosure.

20. FOIA Exemption (b)(7)(C) applies a similar balancing test to information that is contained in a file that was "compiled for law enforcement purposes," when release of the information could reasonably be expected to constitute an unwarranted invasion of personal privacy.

21. When balancing the invasion of personal privacy against the public interest in the disclosure of the information in question, the relevant determination as to the public interest is whether release would contribute significantly to public understanding of the operations or activities of the government.

22. FOIA Exemption (b)(6), 5 U.S.C.§552(b)(6), provides that an agency may withhold matters that are "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

23. In order to invoke FOIA Exemption (b)(6) as to the withheld records, NPS FOIA first concluded that the withheld records qualified as a "personnel, medical or similar file" under 5 U.S.C. § 552(b)(6). NPS FOIA determined that, because the withheld records contained information relating to allegations of work-related misconduct by NPS personnel, these records qualified as "personnel" or "similar files" under Exemption (b)(6). Moreover, these records contain information which applies to particular, identifiable individuals.

24. FOIA Exemption (b)(7)(C), 5 U.S.C. § 552(b)(7)(C), protects from disclosure records or information "compiled for law enforcement purposes" if a release of the records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy."

25. 5 U.S.C. § 552(b)(7) establishes a threshold requirement that, to withhold information on the basis of any of its subparts, the records or information must be compiled for law enforcement purposes. The records as to which the NPS FOIA Office asserted Exemption (b)(7) satisfy this threshold requirement.

26. In invoking one of (b)(7) exemptions, NPS FOIA determined that the Investigatory File responsive to the FOIA request was compiled for law enforcement purposes. This file is the record of OPR's investigation pursuant to an allegation employee misconduct. OPR investigated the complaint to determine whether there had been any violations of law, regulation, or policy. Accordingly, NPS concluded that the Investigatory File was a record compiled for law enforcement purposes under exemption (b)(7).

27. Specifically, NPS FOIA applied Exemption (b)(7)(C), in conjunction with Exemption (b)(6), to protect from disclosure the names and identifying information of subject(s), witnesses, and other third parties mentioned in the file. NPS FOIA determined that individuals being investigated or otherwise associated the events underlying the claims of misconduct have a significant privacy interest in the information withheld, and those interests could be harmed by the release of the withheld parts of the Investigatory File. Accordingly, NPS FOIA determined that the release of the withheld information would constitute a clearly unwarranted invasion of these parties' personal privacy.

28. The withheld contents of the Investigatory File, relate to a small number of low-level, non-supervisory NPS personnel who are known to each other, and who work in a small office, and are part of a small community, as well as members of the community of Gardiner. The greater part of the file consists of transcripts and investigator narratives drawn from those transcripts and full of direct quotation as well as paraphrases of the interviews transcribed. As

such it would likely be easy for parties familiar with the Mammoth Office and/or the community of Gardner to ascertain the identities of parties who were interviewed by investigators, as well as third parties mentioned by interviewees, based on the details provided in the file. Due to the small size of the Mammoth Office and the community of Gardiner, descriptions of locations and events, or mention of facts that would reasonably be known by a few specific individuals would serve to identify individuals even if their names and basic identifying information were redacted from the documents.

29. Revealing the withheld content of the Investigatory File risks disclosing the identities of these individuals who made statements, including agency personnel and third parties, who would be identifiable from content of the withheld material. The NPS personnel and third parties in question have an interest in having their identities shielded from disclosure, because they may be exposed to harassment, embarrassment, unnecessary questioning, possible interference with official duties, and reprisals against government personnel as a result of the alleged misconduct detailed in the investigation, and/or because of their association with the internal investigation. Moreover, such potential consequences could discourage employees, witnesses, and third parties from participating in internal investigations in the future. Additionally, the subjects of unsubstantiated or only partially substantiated allegations of misconduct have an even greater privacy interest in avoiding the stigma and potential reputational harm caused by disclosure of such allegations.

30. Under Exemptions 6 and 7(C) the agency is required to balance the privacy interest that would be affected by disclosure against the cognizable public interest in the information. Under the FOIA a cognizable public interest is one that is significant and which would shed light on the agency's performance of its statutory duties or otherwise let citizens

know what the government is up to. In his FOIA request, Plaintiffs claimed that release of the requested records would be directly relevant to two deliberations of public interest:

> The first is the ongoing formulation of regulations in Montana for the state's 2022 wolf hunting season, an issue of extraordinary local and national interest. The second is an ongoing review of by the Department of the Interior concerning the potential re[l]isting of wolves in the Northern Rockies under the Endangered Species Act, which was launched in part in response to the nature of Montana's 2021 wolf hunting – including concern over incidents like the one at the center of the request.

31.    In conducting the balancing required under Exemptions 6 and 7(C), NPS FOIA determined that the disclosure of the withheld parts of the Investigatory File, along with the identities and personal details of agency personnel and third parties named therein, would not serve a cognizable public interest. The information withheld, concerning an internal investigation of alleged misconduct associated with a single incident involving the alleged actions of low-level, non-supervisory personnel in a single small office would provide minimal information to the public concerning how NPS or even NPS OPR carries out its responsibilities. This is particularly the case to the extent specific alleged facts and/or violations described in the Report were investigated and found to be unsubstantiated or only partially substantiated. Whatever the minimal cognizable public interest in substantiated misconduct associated with a single incident involving low-level, non-supervisory personnel in a single small office, there is no cognizable public interest in disclosure concerning allegations that, after investigation, are not found to have a factual basis.

32.    NPS FOIA considered Plaintiffs claims regarding how release of the requested records would serve the public interest. Setting hunting regulations for the state of Montana, however, is not a role or responsibility of the NPS or the Department and the nexus between that State process and the Investigatory File was unclear. While listings, de-listings, and re-listings of

species under the Endangered Species Act (ESA) are responsibilities of the U.S. Fish and Wildlife Service which is also part of the Department, it was also not clear to NPS FOIA how the Investigatory File for an internal NPS misconduct investigation involving low-level, non-supervisory personnel would let the public know "what the government was up to" with regard to any potential re-listing of wolves in the Northern Rockies under the ESA.

33. NPS FOIA accordingly determined that the significant privacy interests of NPS personnel and third parties in the parts of the Investigatory File withheld under FOIA Exemptions (b)(6) and (b)(7)(C) outweighed the limited or nonexistent public interest in release of that same material. Moreover, for the reasons stated above, NPS FOIA concluded that the disclosure of the investigatory material withheld under FOIA Exemptions (b)(6) and (b)(7)(C) would foreseeably cause harm to interests protected under the FOIA.

IV. **Segregability and Additional Releases**

34. 5 U.S.C. § 552(b) requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

35. Ms. Wilson, my predecessor, in processing the response performed a segregability analysis and released those pages and parts of pages that contained non-exempt material. In the course of the present litigation, I have reviewed the file associated with the request, including the Intercept article cited by Plaintiffs, and have also reviewed line-by-line all the responsive materials and the redactions to determine whether any additional material might be releasable.

36. Based on my review, I have determined that the release of two images taken from a publicly available website and included on one page of the narrative in the Investigatory File, and again within an Investigative Report associated with the statement of a witness, would not

reasonably be expected to constitute an unwarranted invasion of the personal privacy of any individual mentioned in the Investigatory File. I also found that four pages (reproduced on two pages of the Investigatory File) of the NPS Code of Conduct included in the Investigatory File could be released because they included numerous sections of the code and as such would be unlikely to reveal the specific alleged violations that were the subject of the investigation and as such release would not be expected to constitute an unwarranted invasion of the personal privacy of any individual; including subject(s) of the investigation, mentioned in the Investigatory File.

37. I also concluded that some words and headings could be released in part without constituting an unwarranted invasion of the personal privacy of any individual mentioned in the Investigatory File. This seems particularly true as this declaration and the attached *Vaughn* Index provides some description of the nature of the individual parts of the Investigatory File.

38. I understand that the revised release, with the redactions described above removed, was provided to counsel for Plaintiff on May 23, 2024. A true and correct copy of this release is attached hereto as **Exhibit E.**

39. As to the remainder of the responsive material withheld, I agree with my predecessor that the redactions under FOIA Exemptions (b)(6) and (b)(7)(C) were appropriate, and that all segregable, non-exempt material has now been released. Because the redactions are under Exemption (b)(6) and (b)(7)(C), I do not consider a discretionary release of exempt material in the responsive Investigatory File to be permissible under law.

40.     In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Signed this 23rd day of May of 2024.

NICHOLAS BANCO
Digitally signed by NICHOLAS BANCO
Date: 2024.05.23 17:10:56 -04'00'

Nicholas Banco, FOIA Officer
Freedom of Information Act Office
National Park Service
U.S. Department of the Interior