UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE INTERCEPT MEDIA INC., *et al.*,

                                    Plaintiffs,

                    -v-

NATIONAL PARK SERVICE, *et al.*,

                                    Defendants.

23 Civ. 10922 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs The Intercept Media Inc. and Ryan Devereaux—respectively, the publisher of *The Intercept* news site and a reporter at *The Intercept* (collectively, the "Intercept")—bring this action against the United States National Park Service and the Department of the Interior (collectively, the "NPS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.* They seek disclosure of records related to an investigation by the NPS's Office of Professional Responsibility (the "OPR") in connection with the January 2022 killing of a gray wolf near the northern boundary of the Yellowstone National Park ("Yellowstone"). The NPS has released approximately 50 pages of the 296-page investigative file, but it has all but completely redacted the balance, citing privacy-related exemptions to its disclosure duty under FOIA. The Intercept challenges the NPS's near-blanket redactions as significantly overbroad.

Pending now are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court grants each motion in part and denies each in part and directs the NPS to review the investigative file anew, guided by the analysis herein of the NPS's FOIA obligations. That review, the Court expects, will result in a substantially more fulsome production of records to plaintiffs.

## I.    Background

### A. Factual Background

#### 1.  Gray Wolves in Yellowstone

The Intercept's FOIA request was made in the context of—and to shed light upon—an ongoing public policy debate over federal and state efforts to regulate wolf hunting, following the recovery of the gray wolf, from near-extinction, in the Northern Rockies.

The gray wolf once ranged over most of the lower 48 states. *See* 74 Fed. Reg. 15,123, 15,123–25 (Apr. 2, 2009).  During the first half of the 20th century, however, intensive hunting and loss of prey and habitat decimated its population. *See* Dkt. 31 ¶ 4 ("MacNulty Decl.").  By the 1960s, it teetered on the brink of extinction. *Id.*

In 1973, the U.S. Fish and Wildlife Service (the "FWS") listed the northern Rocky Mountain gray wolf as an "endangered" species, bringing it within the protections of the Endangered Species Act (the "ESA"), 16 U.S.C. § 1531 *et seq. See* 38 Fed. Reg. 14,678, 14,678 (June 4, 1973).  The ESA, in general, makes it unlawful for any person to "take any [endangered] species within the United States." 16 U.S.C. § 1538(a)(1)(B); *id.* § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."); *see also id.* § 1533(d) (empowering FWS to issue regulations "as necessary and advisable" to "provide for the conservation of [endangered] species").  Beginning in 1995, the FWS trapped wolves in Canada for release into Yellowstone, as part of a broader effort to promote the survival of the gray wolf. *See* MacNulty Decl. ¶¶ 4–5.  Over the ensuing 30 years, gray wolves have gradually reoccupied lost habitat across the Northern Rockies, and their population has rebounded. *Id.* ¶¶ 6–8.

Citing this recovery, in 2011, the FWS removed the northern Rocky Mountain gray wolf from the Endangered Species List. *See* 76 Fed. Reg. 25,591, 25,591 (May 5, 2011); MacNulty

Decl. ¶ 9.  Although this delisting did not legalize hunting wolves *within* Yellowstone—doing so remains a criminal offense under 16 U.S.C. § 26—it restored primacy to states over the regulation of wolf hunting *outside* Yellowstone's boundaries, in Montana, Wyoming, and Idaho. *Id.* ¶¶ 10–12.

Regulation of wolf hunting has proven politically contentious in those states.  The successful reintroduction of gray wolves by conservationists received a mixed response, with some urging the deregulation of wolf hunting as a means of substantially reducing their numbers; those efforts gathered pace after the FWS delisted the northern Rocky Mountain gray wolf in 2011. *Id.*  Chief among the proponents of lifting hunting restrictions were ranchers along Yellowstone's boundaries, who cited instances in which wolves that had wandered out of the park had killed their livestock. *See* Dkt. 30 at 4.

Relevant here, in 2021, Montana lifted restrictions on the number of wolves that hunters could kill outside Yellowstone's northern border.  MacNulty Decl. ¶¶ 10–12.

## 2.  The Yellowstone Wolf Project

The gray's wolf return to Yellowstone has been closely tracked and studied by a wildlife restoration, conservation, and research initiative known as the "Yellowstone Wolf Project."  To study the gray wolf's place in the "structure and function of natural ecosystems," the project has followed a large number of wolves over their lifetimes by placing wildlife-tracking collars on them. *Id.* ¶ 6.  These collars broadcast the wolves' locations through (1) a very high frequency ("VHF") beacon; and (2) a satellite-based global positioning system ("GPS"). *Id.* ¶ 14; *see also id.* ¶ 16.  The information gathered by the Yellowstone Wolf Project has expanded knowledge on topics including the movement of wolf packs, their interaction with elk and other big prey, and corresponding effects on the flora in Yellowstone. *See id.* ¶ 8.

Each VHF collar transmits a unique VHF frequency that is intended to be accessible only by NPS employees. *See id.* ¶ 14. Non-NPS employees, including wolf hunters, can detect these frequencies, however, with a radio scanner; hunters stand a better chance of doing so if they tune their scanners based on the VHF frequencies of previously killed collared wolves. GPS, which is more precise than VHF, is accessible only to NPS employees. *Id.*

### 3.  The Killing of Wolf 1233 and Helms's Interview

On January 30, 2022, a collared wolf—identified as "Wolf 1233" by the Yellowstone Wolf Project—was shot and killed near the northern boundary of Yellowstone. Dkt. 26-6 at 5–6. The NPS determined that the wolf had been killed outside the park at or around 6:15 p.m. that day. *Id.*

In or around July 2022, Brian Helms, an NPS park ranger in Yellowstone when Wolf 1233 was shot, stated, in an on-the-record interview with *The Intercept*, that he had killed Wolf 1233. Compl., Ex. A at 23–24 (the "Intercept Interview"). [1] Helms there stated that he had worked for the NPS since 1985. *Id.* He described his duties, in the two decades leading up to January 2022, as including patrolling Yellowstone's northern boundary on horseback. *Id.* While at work on January 30, 2022, Helms stated, he had observed wolves near the northern boundary, and decided to go wolf-hunting after his shift ended. *Id.* After he got off work, Helms continued, he met up with another individual, and they drove to an area near the park's boundary, called Beattie Gulch, close to where Helms had spotted the wolves earlier that day. *Id.* at 24. It was there that he shot Wolf 1233, from a distance of about 250 yards. *Id.*

---

[1] The interview was included in *The Intercept*'s report about the incident, which was published on July 20, 2022. The Intercept Media, Inc., based in New York, NY, publishes *The Intercept* news site.

In the interview, Helms denied violating federal or state law in killing Wolf 1233. He stated that Wolf 1233 had been outside park boundaries when he killed it and that he had shot the wolf before the cutoff time prescribed by state hunting regulations. He stated:

> Nobody on Earth knows that boundary better than I do. . . . I put every boundary marker up there. I know exactly where that's at. I'm not going to jeopardize my retirement over a wolf. I guarantee you that. . . . I checked [the time] prior to . . . shooting at that wolf, I know that, and I still had several minutes yet.

*Id.* Helms also denied knowing, at the time he shot the wolf, that it was a research subject; he stated that he noticed the collar only afterward, when he walked up to the dead wolf's body. *Id.* By that denial, Helms effectively denied having been tipped off to Wolf 1233's whereabouts via VHF or GPS collar data accessible through his NPS job.

In the same interview, Helms stated that, shortly after Wolf 1233's killing, Chris Flesch, then-deputy chief park ranger at Yellowstone, had informed Helms that certain "allegations" of misconduct had been made against him. *Id.* at 25. Helms described the accusation this way: "That while I was on duty working, I would locate animals and give their locations to people outside the park who were hunting those animals . . . part of this big conspiracy, this big wolf conspiracy." *Id.* at 25–26. Helms described the resulting NPS investigation as a "witch hunt" in which he and at least two other Yellowstone park rangers were wrongly accused of involvement in a "conspiracy" to leak government information about wolves to hunters. *Id.* at 7, 25–26. After the NPS initiated an investigation into those allegations, Helms stated, he did not sit for an interview with the NPS investigators, although the other park rangers allegedly involved in the conspiracy had done so. *Id.* at 26. Helms likened the investigators to "kindergarten cop[s]" who "had no idea what they were even doing." *Id.* Shortly after he learned of the allegations, Helms stated, he had resigned his NPS position. *Id.* at 25.

### 4.  The Intercept's FOIA Request

On June 20, 2022, Devereaux submitted a FOIA request to the NPS.  It sought disclosure of the following records:

> On January 30, 2022, a wolf that was collared and studied by Yellowstone National Park staff was shot and killed outside park boundaries in Southwest Montana, near an area known as Beattie Gulch.  The individual who shot and killed this animal was a National Park Service employee.  The National Park Service staff conducted an investigation into this incident and the conduct of its employee.  I am seeking all files created by the National Park Service in conjunction with this investigation.

Compl. Ex. B (the "FOIA Request") at 2.

On July 15, 2022, the NPS granted in part and denied in part the FOIA Request.  Dkt. 26 ¶ 8 ("Banco Decl.").  It identified a 296-page investigative file (the "Investigative File") as responsive to the FOIA request.  The NPS redacted 247 of the 296 pages in the Investigative File, the vast majority of which were redacted in full, based on FOIA Exemptions 6 and 7(C).[2]  It explained that the Investigative File had been prepared in connection with OPR's "internal investigation in response to a complaint" received on February 10, 2022, "related to allegations of misconduct by personnel at an NPS Office in Yellowstone National Park."  *Id.*  It did not identify the individuals who were the subjects of that complaint.

On October 4, 2022, the Intercept appealed the NPS's partial denial of the FOIA Request to the Department of the Interior.  *Id.* ¶ 9.  On August 21, 2023, the Department of the Interior affirmed the NPS's determination.  *Id.*

---

[2] After the Intercept filed this suit, on May 23, 2024, the NPS reproduced the file removing its redaction, in principal part, of two images taken from a publicly accessible webpage and two pages reciting sections of the NPS code of conduct.  Banco Decl. ¶¶ 36–38.

### B. Procedural History[3]

On December 15, 2023, the Intercept filed this lawsuit, claiming that NPS's heavily

redacted production did not comply with FOIA, and seeking an order mandating compliance.

Dkt. 1. On February 9, 2024, the NPS filed an Answer. Dkt. 10. On February 16, 2024, the

Court held an initial conference and directed the NPS to provide the Intercept with a draft index

of the information withheld, commonly known as a "*Vaughn* index," by March 15, 2024.

Dkt. 19; *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). On April 15, 2024, the parties

filed a joint status report, stating that the NPS had provided a draft *Vaughn* index and proposing

a schedule for summary judgment briefing to resolve the outstanding issues. Dkt. 20. The next

day, the Court endorsed the briefing schedule proposed by the parties. Dkt. 21.

On May 23, 2024, the NPS moved for summary judgment. Dkt. 24. In support, it filed a

memorandum of law, Dkt. 25 ("NPS Br."), the *Vaughn* index, Dkt. 26-5, and a declaration by

Nicholas Banco, a FOIA Officer at the NPS, which outlined the NPS's processing of the

Request, its search for responsive records, and its production of the redacted Investigative File,

*see* Dkt. 26. The NPS also filed a copy of the Investigative File in the form it had been produced

to the Intercept. Dkt. 26-6 (the "Redacted File").

On June 28, 2024, the Intercept filed a cross-motion for summary judgment, Dkt. 29, a

supporting memorandum of law, Dkt. 30 ("Intercept Br."), and a request for judicial notice of

government reports on Yellowstone wolf conservation and relevant Montana hunting

regulations. It submitted declarations by (1) Professor Daniel MacNulty of Utah State

University, who studies wildlife conservation and has authored multiple books related to gray

---

[3] For exhibits and briefs with both internal and Bates-stamped numbering, the Court cites the
Bates-stamped page numbers.

wolves in Yellowstone, Dkt. 31; and (2) Sarah E. Burns, Esq., counsel for the Intercept, in support of the Intercept's request for judicial notice, Dkt. 32.

On July 24, 2024, the NPS replied. Dkt. 35 ("NPS Reply Br."); *see also* Dkt. 36 ("Suppl. Banco Decl."). On August 2, 2024, the Intercept replied. Dkt. 35 ("Intercept Reply Br.").

On November 18, 2024, the Court ordered the NPS to submit an unredacted copy of the Investigative File for the Court's *ex parte*, *in camera* review. Dkt. 39 at 1. The Court explained that such review would enable it to better evaluate the NPS's withholding decisions. *Id.* The Intercept had colorably argued, the Court explained, that the NPS had redacted information without adequately (1) justifying its non-disclosure, and (2) explaining why any unprotected information was not reasonably segregable from information exempt from disclosure. *Id.* at 2. The Court noted that the NPS made only generalized assertions on this point. *Id.* at 3.

On November 20, 2024, the NPS filed an unredacted copy of the Investigative File under seal. Dkt. 40 (the "Unredacted File").

### C. Information Withheld by the NPS

Based on the Court's *in camera* review of the Investigative File, the file—and the portions thereof that NPS has redacted—can be described, at a high level, as follows:

(1) ***Investigator's report***: This is a 25-page narrative by the OPR investigator. The NPS has applied blanket redactions to approximately 22 of 25 pages, which identify the specific allegations of misconduct, and summarize the course of the investigation, the evidence, and its findings. The portions released by NPS reveal that, based on GPS collar data, Wolf 1233 was killed at Beattie Gulch at or about 6:15 p.m.; that the investigative target was a park ranger; and that the complainant was "internal." *See*

Redacted File at 3 (case subject), 6 (complainant), 8 (GPS location). The NPS has released the names of the investigator and his supervisor. *Id.* at 3.

(2) ***Citations to regulations and code of conduct sections***: The NPS has released in full portions reproducing sections of Montana state hunting regulations and the NPS code of conduct. It has redacted citations to specific provisions, alleged violations of which were the subject of the misconduct investigation. *Id.* at 4–5 (citations); 28–75 (Montana regulations), 76–80 (code of conduct). It also has redacted in full its citation to, and recitation of, federal regulations alleged to have been violated. *Id.* at 76–77; 81–82; *see* Supp. Banco Decl. ¶ 5 (noting possible violation of federal regulations).

(3) ***Transcripts of interviews***: The OPR interviewed witnesses, suspected co-conspirators, and other third parties, and collected notes, photographs, recordings, and signed statements from those interviewees. The NPS has applied blanket redactions to these materials. *Id.* at 91–161, 168–212, 218–50, 256–80.

(4) ***Investigator's summaries***: The NPS has redacted virtually the entirety of the investigator's summaries of those interviews, which are presented as "investigative activity reports." These include the interviewee's identity and personal information, such as place of employment, as well as the investigator's synopsis of the information provided. *Id.* at 84–90, 163–66, 214–216, 252–54.

(5) ***Data from NPS cellphone(s)***: These include images and records of communications collected from cellphone(s) issued to NPS employee(s). The NPS has redacted these in full. *Id.* at 281–297.

The NPS has cited both FOIA Exemptions 6 and 7(C) in support of its redactions. *See* Vaughn
Index at 2–12.

## II.    Applicable Legal Standards

### A.  Summary Judgment Motions Under FOIA

FOIA requires federal agencies, "upon any request for records," to "make the records
promptly available to any person." 5 U.S.C. § 552(a)(3). "The basic purpose of FOIA is to
ensure an informed citizenry, vital to the functioning of a democratic society, needed to check
against corruption and to hold the governors accountable to the governed." *John Doe Agency v.
John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). Congress recognized, however,
"that legitimate governmental and private interests could be harmed by release of certain types of
information," *id.*, and accordingly exempted nine categories of records from the government's
"broad" duty of disclosure, *U.S. Dep't of Just. v. Reps. Comm.*, 489 U.S. 749, 755 (1989); *see
also, e.g.*, *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

These "exemptions are explicitly made exclusive, and must be narrowly construed."
*Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citation omitted). "The agency asserting the
exemption bears the burden of proof, and all doubts as to the applicability of the exemption must
be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009).
Even if portions of a responsive record are properly exempt, the agency must "take reasonable
steps necessary to segregate and release nonexempt information." 5 U.S.C.
§ 552(a)(8)(A)(ii)(II); *see FBI v. Abramson*, 456 U.S. 615, 626 (1982).

FOIA cases are typically and appropriately resolved at summary judgment. *See, e.g.*,
*Johnson v. CIA*, No. 17 Civ. 1928, 2018 WL 833940, at *2 (S.D.N.Y. Jan. 30, 2018); *Carney v.
U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994). "Summary judgment is warranted on the
basis of agency affidavits when the affidavits describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation omitted).

### B.  FOIA Exemptions 6 and 7(C)

Exemption 6 excludes from disclosure "personnel and medical files and similar files" if their disclosure would result in "a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "[U]under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). When an agency invokes Exemption 6, a court "must first determine whether the[] disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest. If no significant privacy interest is implicated (and if no other Exemption applies), FOIA demands disclosure." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If a substantial privacy interest is at stake, however, the court "must weigh that privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, disclosure would work a clearly unwarranted invasion of personal privacy." *Id.*

Exemption 7(C) protects records "compiled for law enforcement purposes" if their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Analogous to the Exemption 6 framework, when an agency invokes Exemption 7(C), a reviewing court must "balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information." *Beck v. U.S. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir.1993); *see also, e.g.*, *Reps. Comm.*, 489 U.S. at 776; *Behar v. U.S. Dep't of Homeland Sec.*, 39 F.4th 81, 91 (2d Cir. 2022). The public interest to be balanced is the extent to which disclosure of the withheld records would "open agency action to the light of public scrutiny,", and vindicate "citizens' right to be informed about 'what their government is up to.'" *Reps. Comm.*, 489 U.S. at 772–73 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)); *see also Behar*, 39 F.4th at 94 (public interest must "focus[] on the statutory purpose to reveal information about agency action").

The balance under Exemption 7(C), however, tilts more toward non-disclosure than it does under Exemption 6. Noting the textual differences between Exemptions 7(C) and 6, the Supreme Court has explained that Exemption 7(C)'s "standard for evaluating a threatened invasion of privacy interests . . . is somewhat broader than the standard applicable to personnel, medical, and similar files" under Exemption 6. *Reps. Comm.*, 489 U.S. at 756. Exemption 7(C) covers "unwarranted" invasions of privacy, whereas under Exemption 6, they must be "clearly unwarranted." *See id.* And Exemption 7(C) shields disclosures that "could reasonably be expected to constitute" an unwarranted invasion of privacy, whereas Exemption 6 demands greater certitude: It exempts disclosures that "would constitute" an invasion of privacy. *See id.*; *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.* ("*FLRA*"), 510 U.S. 487, 496 n. 6 (1994) ("Exemption

12

7(C) is more protective of privacy than Exemption 6."); *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165–66 (2004).

"When information is claimed to be exempt from disclosure under both provisions, courts 'focus . . . on Exemption 7(C) because it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* ("*CREW II*"), 854 F.3d 675, 682 (D.C. Cir. 2017); *see also, e.g., Perlman v. U.S. Dep't of Just.* ("*Perlman I*"), 312 F.3d 100, 105 (2d Cir. 2002), *vacated*, 541 U.S. 970 (2004), *reaff'd on remand, Perlman v. U.S. Dep't of Just* ("*Perlman II*"), 380 F.3d 110 (2d Cir. 2004) ("Because both exemptions are implicated here, we apply the stricter 7(C) evaluation of privacy interests."); *ACLU v. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011) ("Although the Justice Department relied on both exemptions [6 and 7(C)] in the district court, we need only consider whether it properly invoked Exemption 7(C)."); *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1267 (10th Cir. 2021) ("Because withholding . . . cannot be justified under the more lenient Exemption 7(C) test, the more stringent Exemption 6 test is likewise unsatisfied."); *cf. Favish*, 541 U.S. at 165–66; *Reps. Comm.*, 489 U.S. at 756.

Accordingly, if the information withheld by the NPS here was "compiled for law enforcement purposes," the Court need only consider whether the NPS properly withheld these documents under Exemption 7(C). Courts in this Circuit have routinely followed this course in evaluating an agency's assertion of Exemptions 6 and 7(C) over the same material. *ACLU v. U.S. Dep't of Homeland Sec.*, 973 F. Supp. 2d 306, 315 (S.D.N.Y. 2013); *BuzzFeed Inc. v. U.S. Dep't of Just.*, No. 21 Civ. 7533, 2022 WL 2223124, at *3 (S.D.N.Y. June 21, 2022), *aff'd*, 2023 WL 4246103 (2d Cir. June 29, 2023); *Radar Online LLC v. FBI*, 692 F. Supp. 3d 318, 350 (S.D.N.Y. 2023) (quoting *CREW II*, 854 F.3d at 682); *cf. Hopkins v. U.S. Dep't of Hous. & Urb.*

*Dev.*, 929 F.2d 81, 86 (2d Cir. 1991) (finding that the withheld records "are protected even under the more exacting standard of Exemption 6" obviated the need to determine whether they were "compiled for law enforcement purposes within the meaning of Exemption 7(C)").

## III.  Discussion

The parties' dispute implicates two main issues:  First, was the information withheld by the NPS compiled for law enforcement purposes?  Second, what is the weight of the privacy interests, if any, implicated by the withheld information?  The Court considers these questions in turn.  The Court then balances, as applied to the withholdings here, the public interest in release against the protected privacy interests, and instructs the NPS as to the implications for its renewed review of the Investigative File.

### A.  Law Enforcement Purpose

To withhold records under Exemption 7(C), an agency must show that they were "compiled for a law enforcement purpose." *Ferguson v. FBI*, 957 F.2d 1059, 1065 (2d Cir. 1992).  The Intercept argues that the NPS has failed to make that threshold showing.  *See* Intercept Br. at 14–16.  The Investigative File was not compiled for a law enforcement purpose, the Intercept maintains, because the underlying OPR investigation was initiated for the purpose of enforcing workplace discipline, rather than for ferreting out a potential violation of the law.

The Intercept's argument misses the mark, because the NPS's affidavits establish that the OPR was investigating, among other infractions, a potential federal criminal offense.  As NPS attests, the OPR initiated the underlying investigation "in response to" allegations of employee misconduct in connection with the killing of Wolf 1233 near the boundary of Yellowstone.  *See* Banco Decl. ¶¶ 10–11; Supp. Banco Decl. ¶ 5.  Part of the misconduct alleged was hunting by an NPS employee within the national park.  *Id.*  If established, such would be a criminal violation of 16 U.S.C. § 26 and 36 C.F.R. § 2.2.  Separately, hunting outside the hours permitted by Montana

state regulations, a theory that was investigated, is a violation of law.  Supp. Banco Decl. ¶ 5. The NPS's supplemental declaration attests that the Investigative File was compiled to "investigate[] NPS employee actions and whether they violated the NPS Code of Conduct, as well as civil and/or criminal law." *Id.* ¶ 10; *cf.* Burns Decl., Ex. E at 141–44 (NPS reference manual setting out the OPR's authority to investigate criminal conduct and/or refer matters to prosecuting agencies);[4] *Associated Press v. U.S. Dep't of Just.*, 549 F.3d 62, 65 (2d Cir. 2008) (agency's affidavit "entitled to a presumption of good faith").  In other words, the affidavits establish that the Investigative File resulted from an OPR investigation that could have led to a criminal enforcement action against the target.  The Court's independent review of the material redacted from that file bears out the affidavits' representations that the allegations under review, if established, could have resulted in criminal liability.

The Court therefore finds that the allegations investigated by the OPR encompass criminal conduct.  And it is well settled that an agency's investigation of its employees is for "law enforcement purposes" where, as here, the investigation "focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved,

---

[4] As requested by the Intercept, Dkt. 33, the Court, pursuant to Federal Rule of Evidence 201, takes judicial notice of the National Park Service, Law Enforcement Program's *Reference Manual – 9* (2015), retrieved from the NPS's official website.  The NPS does not dispute the manual's authenticity.  NPS Reply Br. at 13; *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (courts may "take judicial notice of the contents of relevant public disclosure documents . . . as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") (citation omitted); *Fernandez v. Zoni Language Ctrs., Inc.*, No. 15 Civ. 6066, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016), *aff'd*, 858 F.3d 45 (2d Cir. 2017) ("Courts regularly take notice of publicly available documents including . . . documents retrieved from official government websites."); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." (internal quotation marks omitted)).

result in civil or criminal sanctions." *Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984) (citation omitted); *see also, e.g., Perlman*, 312 F.3d at 105; *Beck*, 997 F.2d at 1492; *BuzzFeed*, 2022 WL 2223124, at *3; *Pagan v. Treasury Inspector Gen. for Tax Admin.*, No. 04 Civ. 4179, 2006 WL 8440892, at *1–3 (E.D.N.Y. Jan. 31, 2006).

The documents contained in the Investigative File thus qualify as records compiled for law enforcement purposes. The NPS has satisfied its initial burden under Exemption 7(C). The Court therefore turns to the privacy interests at stake, and whether these are overcome by the public interest in the release of the requested information.

### B. Privacy Interests Under Exemption 7(C)

Exemption 7(C) recognizes privacy interests "encompass[ing] the individual's control of information concerning his or her person." *Reps. Comm.*, 489 U.S. at 763. These privacy interests "embody the right of individuals to determine for themselves when, how, and to what extent information about them is communicated to others." *Associated Press*, 549 F.3d at 65 (internal quotation marks omitted). The Supreme Court has eschewed a "cramped notion of personal privacy" in this area. *Reps. Comm.*, 489 U.S. at 764 n.16.

Relevant to the withholdings here, courts have held that "individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." *Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885, 893–94 (D.C. Cir. 1995); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* ("*CREW I*"), 746 F.3d 1082, 1091 (D.C. Cir. 2014). Courts have recognized, moreover, that "not only the targets of law-enforcement investigations, but also witnesses, informants, and investigating agents have a substantial interest in ensuring that their relationship to the investigations remains secret." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (cleaned up); *see also,*

*e.g.*, *Schrecker v. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003); *Seife v. Dep't of State*, 298 F. Supp. 3d 592, 628–29 (S.D.N.Y. 2018); *Germosen v. Cox*, No. 98 Civ. 1294, 1999 WL 1021559, at *15 (S.D.N.Y. Nov. 9, 1999). That is because "the mention of an individual's name in a law enforcement file" could "engender comment and speculation and carries a stigmatizing connotation," *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (citation omitted), and public association with an investigation "may result in embarrassment and harassment," *Comput. Pros. for Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996) (quoting *McDonnell v. United States*, 4 F.3d 1227, 1255 (3d Cir. 1993)); *see FLRA*, 510 U.S. at 497; *Reps. Comm.*, 489 U.S. at 780. These protections attach to information identifying suspects, witnesses, and investigators involved in an *internal* agency investigation. *See Perlman*, 312 F.3d at 106–08 (witnesses and third parties had "strong" privacy interests; investigative target's privacy interest was "somewhat diminished"); *Wood v. FBI*, 432 F.3d 78, 80–81 (2d Cir. 2005) (Sotomayor, J.) (finding cognizable privacy interests in names and other information identifying FBI agents who investigated allegations of misconduct by an agent).

Invoking this line of authority, the NPS claims that two sets of privacy interests are at stake. First, the NPS argues that the target of the OPR's investigation has privacy interests in the nondisclosure of (a) his identity and (b) the content of the allegations made. Second, it argues that the interests of third parties—the complainant, persons who were interviewed, and any suspected co-conspirators—favor keeping secret their association with the investigation. The Court considers in turn each set of privacy interests asserted by the NPS.

### 1. Privacy Interests of the Investigative Target

The NPS argues that Exemption 7(C) protects the target of the OPR investigation from disclosure of his identity and of the allegations made against him. *See, e.g.*, Gov't Br. at 11, 15. Disclosure of this information, the NPS maintains, could subject the target to harassment and

public scorn for allegedly joining in a conspiracy to aid wolf hunting, a controversial practice in the small community in which Wolf 1233 was killed. *Id.* at 19. The Intercept counters by noting that Helms has publicly acknowledged that he was the investigation's target. It argues that, in so doing and in describing the allegations against him, Helms waived the privacy interests he might otherwise have had.

At the threshold, the Intercept is correct that Helms, by publicly announcing that he was the investigative target, has waived any privacy interest in that fact. *See, e.g., Kimberlin v. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998) (prosecutor's public acknowledgment that he was target of disciplinary proceedings vitiated any privacy interest in being identified as the investigative target); *Nation Mag.*, 71 F.3d at 896 (politician waived right to have his name redacted from responsive documents covering events he had publicly discussed). As a result of Helms's on-the-record interview with *The Intercept*, the public already knows that Helms was suspected of misconduct in connection with the killing of Wolf 1233, including improprieties committed with others, and that these allegations had prompted an investigation by the NPS.

At the same time, Helms retains a distinct, albeit significantly diminished, privacy interest in the *details* of the investigation and the allegations against him, to the extent he has not disclosed these details. Exemption 7(C) recognizes that, not only a target's identity, but also the "[a]ccusations and derogatory statements made against" him, may, when disclosed, "result in an intrusion on [his] personal privacy by causing embarrassment and reputational harm," whether or not these allegations are later substantiated. *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 849 F. Supp. 2d 13, 31–32 (D.D.C. 2012); *see also, e.g., McCutchen v. Dep't of Health & Hum. Servs.*, 30 F.3d 183, 187–88 (D.C. Cir. 1994); *Carter v. Dep't of Com.*, 830 F.2d 388, 391–92 (D.C. Cir. 1987). The decision in *Kimberlin v. Department of Justice* underscores this point.

18

The D.C. Circuit found that a prosecutor who had publicly acknowledged that he was the subject of a disciplinary investigation retained a privacy interest in the contents of the disciplinary file. 139 F.3d at 949. Although his public statement "undoubtedly" diminished his privacy interest, the Circuit held, he "did not, merely by acknowledging the investigation and making a vague reference to its conclusion, waive all his interest in keeping the contents of the [disciplinary] file confidential." *Id.*; *accord CREW I*, 746 at 1092 ("Although DeLay's action lessened his interest in keeping secret the fact that he was under investigation, he retained a second, distinct privacy interest in the contents of the investigative files.").

Salient here, Helms's public statements, in recounting the allegations against him, made more than a "vague reference" to the nature of these. He disclosed to *The Intercept* that he had learned from NPS deputy chief ranger Flesch that he was accused of (1) leaking government information to hunters in a "big conspiracy" to hunt Yellowstone wolves and (2) personally using such proprietary information to kill Wolf 1233, for personal gain. Intercept Interview at 7, 25–26. Helms also described the ensuing investigation, which he belittled as conducted by "kindergarten cop[s]." *Id.* at 26; *see also id.* ("The people that were officially in charge of this investigation . . . had no idea what they were even doing."). In these ways, Helms injected into the public domain his status as a target, the type and concerted nature of the alleged misconduct, and his views about the quality of the NPS's investigation into those allegations. He therefore waived his interest in keeping private those aspects of the investigation implicated by his public statements.

Helms did not, however, give up "all his interest" in every detail of the investigation. *Kimberlin*, 139 F.3d at 949; *cf. Ferrigno v. U.S. Dep't of Homeland Sec.*, No. 9 Civ. 5878, 2011 WL 1345168, at *8 (S.D.N.Y. Mar. 29, 2011) ("Lower-level officials generally have a stronger

interest in personal privacy than do senior officials."). Revealing though they otherwise were, Helms's public statements do not establish that the allegations described to him by Flesch were in fact the allegations investigated by the OPR—or the entirety of them. Insofar as the public has not been given—by Helms or otherwise—a clear roadmap of the allegations actually investigated by the OPR, Helms retains a privacy interest, albeit a weak one, in the details of the investigation that are not already in the public domain.

### 2. Privacy Interests of Third Parties[5]

It is undisputed that the complainant, the persons the NPS interviewed, and other third parties have substantial privacy interests protected by FOIA. *See* Gov't Br. at 15; Intercept Br. at 19. That includes investigative subjects other than Helms, because, based on the record before the Court, no such person has publicly so identified himself or herself.[6] The parties also agree that privacy interests justify redacting those persons' names and other personally identifying data (*e.g.*, their job titles). Intercept Br. at 19; Intercept Reply Br. at 3; *see also, e.g.*, *Schrecker*, 349 F.3d at 661 ("On the privacy side of the ledger, our decisions have consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants."). They

---

[5] For avoidance of doubt, the term "third parties," as used here, encompasses the complainant, witnesses, suspected co-conspirators, and any other individuals involved in the investigation whose identity has not been publicly disclosed by Helms's Intercept Interview or the already-released portions of the Investigative File. The name and title of the OPR investigator and his supervisor have already been disclosed to the public, *see* Investigative File at 2 (unredacted portion). Thus, neither has a privacy interest in the fact of his or her involvement.

[6] The Intercept does not appear to dispute that such persons retain cognizable interests in keeping their identities private. *See* Intercept Br. at 16–22; Intercept Reply Br.at 1–2 (arguing against "total secrecy" as to factual information). Helms's waiver does not waive the separate privacy interests held by other persons to whom the Investigative File refers. *See CREW I*, 746 F.3d at 1092 n.3; *Kimberlin*, 139 F.3d at 949.

disagree, however, whether those third parties have privacy interests in the factual information they provided other than their names and personal data.

Courts addressing similar privacy claims under Exemption 7(C) have recognized that the redaction of an individual's name and personal data would be insufficient to protect his or her privacy interest where other information could prove "identifying" within the smaller community in which the relevant conduct occurred.  For example, the FOIA request in *Department of Air Force v. Rose*, 425 U.S. 352 (1976), sought case summaries of honor and ethics hearings from the United States Air Force Academy, "with personal references or other identifying material deleted," *id.* at 355.  The Supreme Court recognized that "what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar, as fellow cadets or Academy staff, with other aspects of his career at the Academy."  *Id.* at 379–81.  Similarly, in *Alirez v. NLRB*, 676 F.2d 423 (10th Cir. 1982), the Tenth Circuit held that redacting names and other identifying data from statements submitted by informants was insufficient to protect their privacy interests, *id.* at 427–28.  Because those documents "relate[d] to a few incidents involving about a dozen people," the court explained, disclosure would enable those "who had specific knowledge of these incidents, to identify readily the informant and persons discussed in each document." *Id.*; *see also Boyd v. Exec. Off. for U.S. Att'ys*, 161 F. Supp. 3d 1, 12 (D.D.C. 2015) (recognizing broader privacy interests in witness memoranda).  The relevant question under Exemption 7(C) is therefore not whether the information about an individual would tend to identify him or her to the world.  It is whether it would tend to identify him or her in the smaller community in which he or she seeks to maintain privacy.

That is a very real consideration in this case. The events OPR investigated occurred in a "very small" workplace in which many of the individuals involved "knew each other well" and interacted on a "routine basis." Banco Decl. ¶ 17. The investigation centered on a park ranger office with an assigned head count of no more than 7–13 NPS employees. *See id.* ¶ 12. As a result, a ranger from the office may be identifiable based on his or her duties alone, including the area of Yellowstone he or she patrols. *Id.*

Furthermore, the NPS has attested, only a small number of non-NPS employees within the local community potentially had relevant information about Wolf 1233's killing near Yellowstone's northern boundary. The closest town, Gardiner, Wyoming, located approximately 4.8 miles away, is a community of approximately 800 people. *Id.* The small ecosystem in which the individuals described lived and worked, the NPS attests, makes it "very likely" that they would be familiar with identifying details of each other's lives and work routines and "particular habits of speech." *Id.* ¶ 17.

In such situations, a portion of the Investigative File that reveals the vantage point from which a witness recounts factual observations has the potential to enable members of the public to identify the witness, or narrow the universe to two or three individuals. And, to the extent only a small number of individuals could have had firsthand knowledge of the incidents, their factual recollections could readily identify them. The NPS has thus shown "a fair possibility" that a member of the local community could identify persons interviewed based on some of the factual information they provided. *Boyd*, 161 F. Supp. 3d at 12; *see also, e.g.*, *Rose*, 425 U.S. at 380; *Comput. Pros.*, 72 F.3d at 904.

The NPS has also explained why identifying such persons could provoke the harms which Exemption 7(C) guards against. It notes that there are "strong feelings" within the

community about wolf hunting. Banco Decl. ¶ 18. And it reasonably explains that publicly identifying the suspected co-conspirators—or witnesses who spoke to OPR—could expose them to harassment, embarrassment, and unnecessary questioning. *Id.* ¶ 29. Reprisals of this sort could also discourage participation in future investigations. *Id.* Courts have consistently given weight to such concerns. *See Comput. Pros.*, 72 F.3d at 904–05; *McDonnell*, 4 F.3d at 1255–57; *Schrecker*, 349 F.3d at 666. Consistent with the overwhelming weight of authority on this point, the Court find that the third parties have a privacy interest in nondisclosure of the factual information they provided, to the extent it has the realistic capacity to identify them.

\* \* \*

In sum, the Court finds, the information the NPS has withheld implicates cognizable privacy interests, albeit ones of differing strengths: (1) Helms has a weak privacy interest in nondisclosure of the details of the OPR's investigation into the allegations against him, and (2) third parties, including interviewees and investigative subjects other than Helms, have a substantial interest in maintaining the confidentiality of their association with the investigation.

The Court next considers the other side of the equation: the public interest in the disclosure of the information in the Investigative File.

### C. Public Interest in Disclosure

The "only relevant public interest" for Exemption 7(C)'s purposes "is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *FLRA*, 510 U.S at 497 (quoting *Reps. Comm.*, 489 U.S. at 773) (cleaned up). "The purposes for which the request for information is made" and "the identity of the requesting party" have "no bearing on the merits of

his or her FOIA request." *Id.* at 496; *see Bibles v. Or. Nat'l Desert Ass'n*, 519 U.S. 355, 356

(1997). The Supreme Court has explained:

> FOIA's basic policy of full agency disclosure unless information is exempted under
> clearly delineated statutory language indeed focuses on the citizens' right to be
> informed about what their government is up to. Official information that sheds
> light on an agency's performance of its statutory duties falls squarely within that
> statutory purpose. That purpose, however, is not fostered by disclosure of
> information about private citizens that is accumulated in various governmental files
> but that reveals little or nothing about an agency's own conduct.

*FLRA*, 510 U.S. at 496 (quoting *Reps. Comm.*, 489 U.S. at 775).

Important here, courts have found "unquestionable public interest" in the disclosure of

information that could provide "insight into how the [agency] addresses allegations of employee

misconduct and misuse of government resources." *Cuban v. Sec. Exch. Comm'n*, 744 F. Supp.

2d 60, 89–90 (D.D.C. 2010); *see id.* at 84 ("There is a compelling public interest in knowing

whether the defendant [agency] conducts investigations free of misconduct by its employees and

how alleged transgressions by its employees are addressed."); *CREW I*, 746 F.3d at 1093

(cognizable public interest in the "diligence of the FBI's investigation"); *cf. Reps. Comm.*, 489

U.S. at 766 n.18 ("[M]atters of substantive law enforcement policy . . . are properly the subject

of public concern.").

Based on the information in the public domain, the Intercept argues that the public has

multiple interests in disclosure of the Investigative File. Intercept Br. at 22–25. Intercept Reply

Br. at 2–3. First, it would shed light on whether the NPS properly investigated allegations that

its employees were part of a conspiracy to misappropriate government information for the

private purpose of enabling them or confederates to kill wolves. Disclosure of this information,

the Intercept argues, would inform the public's assessment of how the NPS responded when

alerted to possible government impropriety in administering the research program for which the

location information was gathered. Second, the Intercept argues, disclosure would inform ongoing broader public policy debates regarding Montana state hunting regulations, the use of telemetry in hunting, and the restoration of the northern Rocky Mountain gray wolf to the Endangered Species List. In support, the Intercept has filed newspaper articles discussing stakeholders' varied policy perspectives on the regulation of wolf hunting in the American West. *See* Burns Decl., Exs. B–D.

The Intercept's first argument is persuasive and powerful. The release of information about the NPS's investigation could surely contribute "to public understanding of the operations or activities of the government." *FLRA*, 510 U.S. at 495. The NPS "is charged with responsibility for the management and maintenance of the National Parks." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 289 (1984). Its ability to carry out that statutory mandate would unavoidably be threatened by the misconduct at issue—the NPS employees' leaking of government information such as wolf-tracking information to enable private parties including other employee(s) to exploit Yellowstone's natural resources—as the public would surely appreciate. And the allegations the NPS explored against Helms and his asserted confederates are of serious misconduct by NPS employees in their official capacities. The alleged conspiracy substantially involved on-the-job conduct; the alleged co-conspirators had access by dint of their government positions to the location information transmitted by the wolves' collars; the location data allegedly misused for private hunting purposes was gathered by a Yellowstone research project; and an alleged co-conspirator, Helms, has publicly admitted to killing Wolf 1233 and suggested that he had tracked the animal while he was performing his official duties.

The public thus has a very strong interest in understanding to what extent and how the NPS has investigated these allegations and, to the extent that these were substantiated, whether

the agency has taken corrective action.[7] Disclosure of the requested information would vindicate a classic right protected by FOIA: "citizens' right to be informed about what their government is up to." *Reps. Comm.*, 489 U.S. at 773; *see also Cuban*, 744 F. Supp. 2d at 89; *CREW I*, 746 F.3d at 1093–94.[8]

The second public interest advanced by the Intercept is more general. It argues that the withheld information has potential to inform discussion about policy issues relating to gray wolf hunting, for example, the use of telemetry to track wolves or the limits that should be put on the hunting of such animals. But these policy issues are not closely tethered to the facts underlying the NPS's investigation or to NPS's performance of its statutory duties, whether in enabling or

---

[7] It is immaterial to this interest that Helms (by his account) resigned from the NPS. The public has an interest in learning of any corrective action regardless whether Helms was a current or former employee. And, as alleged, he had conspired with other NPS employees (some presumably still employed there) to misappropriate data about the location of wolves. *See* Intercept Interview at 25.

[8] The NPS's reliance on *Favish*, 541 U.S. 157 on the public interest element of the FOIA inquiry is misplaced. The FOIA request at issue there sought the release of photographs showing the condition of the body of deputy White House counsel Vincent Foster at the scene of his death. It asserted a public interest in "uncovering deficiencies or misfeasance in the Government's investigations" into the death, which had concluded that Foster had committed suicide. *Id.* at 157–59. The requester's "bare suspicion" of impropriety, the Supreme Court held, did not support disclosure of the photographs under Exemption 7(C). *Id.* at 174. To accept the requester's speculation in the face of "the unanimous finding" to the contrary of five separate government investigations, the Court stated, was "to engage in a state of suspended disbelief." *Id.* at 173, 175. This case is far afield from *Favish*. The public interest asserted by the Intercept is not founded on speculation, but on factual information disclosed by the NPS itself, *see, e.g.*, Redacted File at 8; Supp. Banco Decl. ¶ 5, and by the investigative target, *see, e.g.*, Intercept Interview 23–27. These disclosures reveal, among potential misfeasance, that Helms tracked Wolf 1233 while on duty, possibly in concert with other park rangers and possibly with the benefit of information as to the wolf's whereabouts that was uniquely in NPS's possession, and that he killed the wolf *after* the hunting cutoff under Montana law, *see* Redacted File at 8. Such would support a belief by a reasonable person that one or more government employees engaged in on-the-job misconduct. *See Favish*, 541 U.S. at 174. The disclosures thus support a public interest both in the quality of the NPS's investigation *and* in the official conduct under investigation.

investigating the misconduct alleged. *Cf. Bibles*, 519 U.S. at 356 (labeling purpose for request as "public" does not establish a cognizable public interest). The policy debates identified by the Intercept are surely important ones that rightly engage members of the public. But they have "little or nothing" to do with the agency's "own conduct" implicated by the Investigative File *Reps. Comm.*, 489 U.S. at 775. And the Court's review of the redacted material in that file confirms the absence of material informing the policy issues identified by The Intercept. As a result, the Court discounts this interest.

In the ensuing discussion balancing the public interest in disclosure of the Investigative File's contents against the cognizable privacy interests, the Court therefore defines the pertinent public interest as in learning about (1) potential misuse of government information by park rangers in the NPS's employ and (2) the NPS's investigation into the same. To the extent that interest is implicated, the Court finds, the public has a weighty interest in the disclosure of the Investigative File's contents, as these can shed important light into how the NPS carries out its statutory duties.

### D. Balancing the Public Interest and Privacy Interests Implicated Here

The Supreme Court has instructed courts undertaking such balancing as follows:

> Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure. First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion of privacy is unwarranted.

*Favish*, 541 U.S. at 172.

The Court has found particularly instructive the Second's Circuit's application of that balancing test in *Perlman I*, 312 F.3d 100. The FOIA request there sought an investigative report prepared by the DOJ's Office of the Inspector General following an investigation into

27

alleged misconduct in the operation of an Immigration and Naturalization Service ("INS") visa program. *Id.* at 102. A central figure in that alleged misconduct was the INS's former general counsel. *Id.* at 103–04. Applying Exemption 7(C), the Circuit held that witnesses and other third parties possessed "strong privacy interests" against being identified as participants in the investigation, as such "could subject them to 'embarrassment and harassment,'" especially if "the material in question demonstrates or suggests they had at one time been subject to criminal investigation." *Id.* at 106 (quoting *Halpern v. FBI*, 181 F.3d 279, 287–88 (2d Cir. 1999)). These privacy interests, the Circuit held, justified the withholding of information that could identify these third parties, because the public had only a "minimal" interest in learning "the identity" of those parties. *Id.*

The Circuit reached the opposite conclusion as to the INS's former general counsel. He stood "on different ground" from the third parties, given his rank, and because his central role in the alleged misconduct had been disclosed by DOJ. *Id.* at 107; *see Perlman v. U.S. Dep't of Just.*, No. 00 Civ. 5842, 2001 WL 910406, at *1, *4 (S.D.N.Y. Aug. 13, 2001) (discussing DOJ declaration which identified the general counsel by name as the investigative target). The Circuit held that the former general counsel's "somewhat diminished" privacy interest "in the details of [the] investigation" was outweighed by the public's "substantially" greater "interest and right to be informed about what their government is up to." 312 F.3d at 108. The Circuit identified five factors supporting that conclusion: the "fairly serious" nature of the wrongdoing; the unavailability of other means to obtain information about the investigation; the report's focus on the general counsel's performance of his public duties; the former general counsel's "high rank" and "direct responsibility" for the alleged misconduct; and the degree to which the report "shed light on government activity." *Id.* at 107–08. The Circuit thus ordered the disclosure of

information pertaining to the general counsel, save for "some minor personal background information." *Id.* at 108.

Tracking the analysis in *Perlman*, the Court's assessment of the extent to which NPS may redact information within the Investigative File sorts this information into two categories. The Court first addresses material implicating Helms's privacy interests in the as-yet undisclosed details of the investigation. His privacy interests in those, as noted, are weak. Materials implicating these interests include the investigator's report and other items in the Investigative File that recount derogatory or accusatory statements made by interviewees. The Court next addresses materials implicating the privacy interests of third parties. Those, as noted, are strong. Materials implicating those interests principally consist of interview transcripts, interview summaries, documentary evidence submitted by witnesses, and communication records.

### 1. Information Regarding Helms

The public's interest in disclosure of information pertaining to Helms decisively outweighs the limited privacy interest he retained in the details of the investigation that were not disclosed by his public statements. As noted, the public has a strong interest in learning whether the NPS took appropriate action in response to allegations that one or more of its employees misused government information and exploited Yellowstone's natural resources for personal gain. The public also has a strong interest in learning whether such misconduct in fact occurred. The public's interest in these subjects is heightened by the concerted nature of the alleged misconduct. Whether such occurred, and whether the NPS responded by probing the alleged misconduct in its midst with energy, enterprise, and integrity, are of obvious public concern.

Those interests mirror the public interests at issue in *Perlman*. As there, disclosure of the allegations against Helms would "shed[] light on government activity," and implicate the target employee's on-the-job conduct. *Id.* at 108. The public has an interest in learning whether Helms

personally exploited and/or externally shared proprietary government information relating to the tracking of wolves. Such heavily favors disclosure. *Id.*; *see also Perlman II*, 380 F.3d at 111–12 (reaffirming public's interest in disclosure of information pertaining to government employee's on-the-job conduct, as opposed to information "that is personal in nature"). Also favoring disclosure is the "degree of wrongdoing" alleged, which appears "fairly serious." *Id.* at 107–08. The released portions of the Investigative File reveal that the allegations against Helms prompted a "Tier I" investigation by OPR. That designation is typically given to investigations initiated in response to complaints that "concern criminal activity and serious misconduct" and "incidents involving a significant use of force or deadly use of force." Burns Decl., Ex. E at 143–44 (NPS reference manual). That designation accords with Helms's characterization of the allegations against him. *See, e.g.*, *Cuban.*, 744 F. Supp. 2d at 84; *CREW I*, 746 F.3d at 1093; *Stern*, 737 F.2d at 93–94. Another factor favoring disclosure is that releasing the portions of the Investigative File that set out the facts bearing on the claimed misconduct and the investigation into it appears to be "the only means available" for the public to gain information about these important matters. As the Second Circuit put the point in *Perlman*: "The government performed the investigation, has exclusive access to [the relevant] records, and is in a unique position to interview witnesses." 312 F.3d at 108.

Four of the five factors identified by the Circuit in *Perlman* thus favor disclosure. The remaining factor is equivocal: Unlike the former general counsel at issue in *Perlman*, Helms did not have a "high rank," although he did have, as alleged, "direct" responsibility, *id.* at 107, for the alleged wolf conspiracy. *Id.* at 107.

The public interest in disclosure of the details of Helms's conduct and the investigation into it is thus strong.

The countervailing privacy interest is weak, given Helms's extensive public disclosure of the allegations against him and his account of the underlying facts. Helms publicly revealed, among other information, that:

- He was the NPS employee who killed Wolf 1233;

- Wolf 1233 was wearing a GPS collar when he killed it;

- His killing of Wolf 1233 instigated an NPS investigation;

- He stood accused of conspiring with at least two other Yellowstone park rangers to leak government information to wolf hunters;

- He had been informed by the deputy chief ranger of these allegations; and

- Other Yellowstone park rangers had killed wolves during the 2021–2022 hunting season.

*See* Intercept Interview at 23–27. Helms's voluntary injection of this information into the public domain decisively tips the balance in favor of disclosing the outstanding details of his conduct and the investigation into it. *Cf., e.g., Nation Mag.*, 71 F.3d at 896 (public disclosure materially diminished investigative target's privacy interest); *Kimberlin*, 139 F.3d at 949 (same).

Accordingly, the Court holds, where the only affected privacy interest is that of Helms, the NPS must disclose the details of its investigation. For avoidance of doubt, the NPS must do so even where the allegations about Helms concern his interactions with others. To be sure, portions of the Investigative File that reference other NPS employees suspected of misconduct and who retain substantial privacy interests in nondisclosure of their identities must be reviewed with care, out of deference to those interests. But, where tailored redactions can reasonably assure that the identity of persons other than Helms will remain private, the NPS may not withhold factual information related to the collective conduct and the alleged conspiracy.

### 2. Information About Third Parties

The NPS stands on much firmer ground in seeking to withhold information implicating the privacy interests of the complainant, witnesses, suspected co-conspirators, and other third parties—that is, persons other than Helms. These interests are "strong" and protecting them is essential to guard against the threat of "embarrassment and harassment." *Perlman*, 312 F.3d at 106; *see also, e.g.*, *Roth*, 642 F.3d at 1174; *Seife*, 298 F. Supp. 3d at 629. The third parties' privacy interests attach to information that reveals identifying characteristics. And the public's interest in the identity of the third parties involved in the investigation is "minimal." *Perlman*, 312 F.3d at 106; *see also, e.g.*, *BuzzFeed*, 2022 WL 2223124, at *7 (finding public lacked an interest in learning identity of investigative target where the government had "already disclosed all the information in the Report that fairly can be said to shed light on government activity"). The Court therefore finds that the privacy interests at stake outweigh the public interest in the information tending to disclose the identity of persons other than Helms, as the disclosure of such "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7).

Applying these principles to delineate the scope of information properly redacted, the court gives substantial deference to the NPS's determination that the transcripts of witness interviews must be withheld in their entirety in order to protect the witness's privacy interests. *See, e.g.*, *Associated Press*, 549 F.3d at 65 (agency's affidavit "entitled to a presumption of good faith" (quoting *Carney*, 19 F.3d at 812). The Court also accepts the NPS's assessment that each transcript reflects individualistic features of speech, details, and factual perspectives that are reasonably likely betray the interviewee's identity within the small park ranger office and local community in which the events at issue took place. Banco Decl. ¶¶ 12, 17, 18, 29. The Court upholds the NPS's determination to withhold, categorically, the transcripts of witness interviews.

However, as to the balance of the Investigative File, the same categorical assessment cannot be made. The Court has reviewed the File *in camera*. It is readily apparent to the Court that the scale of redactions far exceeds that which is warranted to protect the interests of third parties in keeping their identities private. A far more nuanced and neutral review—one that will result in substantially greater public disclosure—is needed to bring the NPS's redactions in line with Exemption 7(C). The existing redactions far exceed the boundaries of that exemption.

### 3. Information to Be Released by the NPS

The Court, lacking the unique perspective of a member of the park ranger office and local community, cannot make line-by-line determinations as to which facts, statements, attributions, and exhibits in the balance of the Investigative File would tend to expose the interviewee's identity. That assessment can be made only by the NPS.

The Court accordingly directs the NPS to review all aspects of the Investigative File, save for the transcripts of interviews of third parties, with the goal of faithfully implementing the Court's directives above. The Court expects such review to result in the disclosure of the very substantial majority of the investigator's report and its recitation of the regulations and code of conduct provisions alleged to have been violated. *See* Unredacted File at 2–26 (report), 76–77 (regulation); 81–82 (same).

The review should result in fulsome disclosure of the allegations against Helms, including that he was alleged to have conspired with other NPS employees to use proprietary government information to hunt wolves, *e.g.*, *id.* at 2–6; the specific legal and code of conduct provisions implicated by these allegations, *e.g.*, *id.* at 4–5; the evidence gathered by the OPR, *e.g. id.* at 295–96 (image), and its findings, *id.* at 25–26. The NPS may, of course, redact personal information about Helms unconnected to the investigation (*e.g.*, his home address). As to other persons, the NPS is to redact information that would identify or otherwise compromise

33

the privacy interests of the complainant, witnesses, suspected co-conspirators, and other third parties. *E.g.*, *id.* at 2 (names of third parties), 5 (Helms's and third parties' personal information), 8 (photograph revealing Helms's appearance), 26 (names of third parties), 276–79 (transcript of recording); 280–94 (communication records implicating third parties' interests); *cf.* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of [exempt] portions . . . .").

With respect to the investigator's summaries of witness interviews, as opposed to the transcripts of these interviews, the Court does not authorize the categorical withholding of these. *See id.* 82–89, 161–65, 212–15, 251–53. On the Court's review, it is apparent that portions of these summaries do not by any means reflect or necessarily tend to reveal details identifying the interviewees. On the contrary, the Court's *in camera* review indicates that considerable portions of factual information covered in the interview summaries are "reasonably segregable" from any identifying details. *See, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 117 (2d Cir. 2014); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) ("[N]onexempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." (citation omitted)); *ACLU v. FBI*, No. 11 Civ. 7562, 2015 WL 1566775, at *3 (S.D.N.Y. Mar. 31, 2015) (same). Although some portions of a summary that quote an interviewee or describe her account of a specific event may have the capacity to identify the interviewee, *see, e.g.*, Unredacted File at 252 (direct quotation), 253 (occupation), other portions recount the course of the investigation and its findings in a manner that does not does not do so, *e.g.*, *id.* at 251 (investigator's synopsis), 252 (question regarding location data).

The NPS has also categorically redacted materials collected from third parties, such as photographs and written notes. *See id.* at 8, 15, 155–58. Again, portions of these materials

appear, based on *in camera* review, to be capable of disclosure without posing a risk of identifying third parties to the park ranger office or members of the community. *E.g., id.* at 8 (picture in bottom half), 157 (factual information). As to all such materials, the Court directs the NPS to disclose factual information unless it is "inextricably intertwined" with the identifying information. *Sussman*, 494 F.3d at 1116.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the parties' cross-motions for summary judgment.

The parties are directed to confer and to submit, by December 20, 2024, a joint letter proposing a prompt schedule pursuant to which the NPS will (1) release to the Intercept a substantially less redacted version of the Investigative File, consistent with the directives in this decision, and (2) furnish the Intercept with a revised *Vaughn* index chronicling the information withheld and the basis for withholding.

The Clerk of Court is respectfully requested to terminate the motions pending at dockets 24 and 29.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 6, 2024
New York, New York